**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 8:07CR238** |
| | ) | |
| **vs.** | ) | |
| | ) | **REPORT AND** |
| **ERVIN CHRISTY,** | ) | **RECOMMENDATION** |
| | ) | |
| **Defendant.** | ) | |

This case is before the court on the defendant's Amended Motion to Suppress Stop, Detention, and Probable Cause to Search Vehicle Without Consent (#27). The motion was heard on November 28, 2007 and was deemed submitted on January 2, 2008 following the submission of post-hearing briefs.

The defendant, Ervin Christy, moves the court for the suppression of all evidence obtained following the stop, detention, and search of a minivan in which he was a passenger. Specifically, Christy alleges that after the conclusion of the traffic stop, law enforcement did not have a reasonable suspicion to justify his further detention, during the detention he was interrogated without the benefit of *Miranda* warnings, and the search of the minivan was conducted without consent or probable cause.

The government counters that the minivan was stopped for a traffic violation. During the stop, law enforcement developed a reasonable articulable suspicion that criminal activity was afoot which justified the deployment of a certified drug dog. The dog alerted, providing probable cause for the search of the minivan.

Christy, in turn, challenges the reliability of the dog's alert.

## FACTUAL BACKGROUND

### A.    Circumstances of the Traffic Stop

David J. Wintle testified that he is an 18 year employee of the Douglas County Sheriff's Department, currently serving in the criminal interdiction division canine unit with his drug dog, Kubo. He and Kubo have been working together since 2006 following Kubo's certification by the Nebraska Law Enforcement Training Center (Ex. 2, No. 5) and the Nebraska State Patrol (Ex. 2, No. 6).

Wintle testified that on June 12, 2007 at about 7:30 in the evening while patrolling Interstate 80 in Omaha, a blue Dodge Caravan minivan caught his attention because one rear taillight was dimmer than the other (25:1-6) and a portion of the out of state in-transit tag naming the issuing state was not clearly visible (25:1-9). Wintle conducted a traffic stop at approximately 30th Street.[1]

Wintle testified that as he approached the minivan on the passenger side he noticed a passenger reclining back in the passenger seat who was out of sight when he made the initial stop (26:21-27:3). Wintle also noticed the presence of a single key in the ignition and the strong odor of an air freshener (27:3-5). Wintle spoke to the driver and asked for his driver's license and proof of ownership of the minivan. After the driver provided the documents, he asked the driver to accompany him to his cruiser where he learned the driver was Anthony Davis and the passenger was the defendant, Ervin Christy.

Once in the cruiser Wintle spoke to Davis about the after-market license plate bracket attached to the in-transit tag which partially obstructed both the number and the

---

[1]Exhibit No. 1 is a videotape containing audio and video of the stop as recorded from Wintle's cruiser.

state of issuance (28:9-12; 29:7-12). He went over Davis' documents to make sure everything was correct and he asked Davis about his travel itinerary. Davis stated he had traveled from Maryland to California for a "cookout" and was traveling back to Maryland (29:16-23). Davis told Wintle he spent two days in California (30:2-4), was unemployed but going to school to open his own business (30:8-10), and that Christy was his cousin (30:16-18).

Wintle testified he left Davis and approached the minivan to talk to Christy because the papers Davis had produced listed Christy as the owner of the minivan (31:1-2). On Wintle's request, Christy produced his driver's license and responded to questions about his travel itinerary which matched the story Davis had given (31:12-18).

Wintle testified that he then returned to his cruiser and again talked to Davis about the bracket obstructing the in-transit tag and told Davis that he was going to write him a warning ticket (32:19-33:1). Wintle also asked Davis what was going on in California and why he and Christy would drive all the way to California from Maryland. Wintle was suspicious because he had two unemployed people traveling across the country, which required a lot of gas and travel time for a very short stay (33:12-19). Also, both Christy and Davis had told him separately that they had left Maryland to go to California on the Friday evening just before the Tuesday he had stopped them (33:20-25). Wintle was concerned that the pair claimed that in four days they had driven from Maryland to California, gone to a family "cookout" or reunion, left California to return to Maryland, and had gotten as far as Omaha (34:8-12). Wintle was also concerned that while Davis and Christy were traveling together and allegedly cousins, neither knew the employment status of the other

(35:7-13).  Wintle also noted that the minivan contained only one suitcase and a couple of plastic bags of clothes (35:19-21).

Wintle testified that approximately 15 minutes after the minivan was stopped, he returned Davis' paperwork and gave him a copy of a warning ticket for an obstructed license plate (36:1-11).  He then asked Davis if he could ask him a few additional questions and Davis told him he could ask some more questions (37:12-17).  Wintle asked Davis to again review the time frames of his travel itinerary (37:17-21), after which Wintle left Davis and went back to the minivan to speak with Christy about his travel itinerary (38:1-5).  Again, both Davis and Christy were consistent in their story that they had left Maryland the previous Friday evening to go to California for a two-day reunion and left California and driven as far as Omaha before being stopped at 7:30 P.M. (38:9-16).

Wintle testified he asked Davis if he was carrying anything illegal in the minivan such as drugs or money and Davis responded "no."  Wintle then asked Davis about searching the minivan and Davis responded that it wasn't his minivan so he could not give consent to search the minivan, but that Wintle could search his luggage (39:6-10).

Wintle then returned to the minivan and asked Christy about searching the minivan and Christy responded "no" (39:15-23).  After Christy denied permission to search, he was removed from the minivan, searched to make sure he did not have any weapons, and moved a short distance to the front of the minivan for his safety.  Wintle then removed his drug dog, Kubo, from his cruiser and deployed Kubo.  Kubo alerted and indicated to the rear of the minivan (42:11-17).

On cross-examination Deputy Wintle again testified that when he first saw the minivan he could not read the state on the in-transit (49:10-13).  He did admit that after

-4-

stopping the minivan and standing at its back bumper, he was able to tell the in-transit was from Maryland but denied that he would not be able to tell if it was valid until he looked at the paperwork in the minivan and matched the paperwork to the in-transit (50:6-14).  Wintle again testified that he was able to detect that the taillight on the driver's side of the minivan was dimmer than the one on the passenger side even though it was daylight at the time of the stop (51:9-17).

The parties stipulated that Kevin Manak, an employee of the Drug Enforcement Administration, would testify that on the evening of June 12, 2007 at approximately 9:55 in the evening he interviewed the defendant, Ervin Christy, and that he advised Christy of his *Miranda* rights using a government form (Ex. 3).  It was further stipulated between the parties that the defendant's statement was voluntarily given under applicable legal principles (67:1-69:14).

### B.    Reliability of Drug Dog

Deputy Wintle testified that he has been assigned to the criminal interdiction division and working with a dog for about two and one-half years.  Exhibit 2 demonstrates that Wintle completed 32 hours of Desert Snow training on highway interdiction in February 2006.  In August 2005 and June 2006, Wintle and his previous patrol dog, Andor, were certified by the Nebraska Law Enforcement Training Center in Grand Island, which is the official state law enforcement training center run by the State of Nebraska.  In September 2005, Wintle completed 16 hours of K-9 law and tactics training.   On October 6, 2006, Wintle and Kubo were certified by the Nebraska Law Enforcement Training Center as handler and detector dog for narcotics.  On May 11, 2007, Wintle and Kubo received

certification from the Nebraska State Patrol for demonstrating performance requirements as a tactical deployment dog team.

Wintle's handling of Kubo at the scene of the traffic stop is depicted on the videotape (Exhibit 1).

Steven Douglas Nicely testified he was retained as a consultant for the defense. Mr. Nicely is licensed in Texas as a police/peace officer and as a police instructor. He is a high school graduate and completed 15 credit hours in behavioral science courses at San Antonio Community College. He has worked with canines for over 30 years, and has received almost 1,000 hours of education regarding the training of canines, dog handlers, and police officers.

Nicely completed his first school at Lackland Air Force Base in 1974, where he was trained in patrol procedures with the dog, trained a dog, and received instruction in drug detection. He has attended numerous schools and seminars on drug detection and the training of police dogs. He has received numerous awards and commendations, and has taught courses on drug detection.

As to his work history relating to drug detection dogs, Nicely began canine in 1973 in the Marine Corps. In 1974 he attended and completed the Lackland schools. He then worked as a drug detector dog handler in the Marine Corps until 1979. After leaving the Marine Corps, he began working with canines in 1981 with Leon Valley Police Department and the Terrell Hills Police Department. He worked for Global Training Academy from 1989 to 1991. He returned to law enforcement work, teaching and training law enforcement officers for about a year, then resumed work at Global Training Academy. He worked for Global for a total of approximately 18 years. Global is a large private company that trains

dogs.   The federal government contracts with Global for some dog training for drug detection, bomb detection, and the like.   Nicely's work at Global was not primarily focused on training drug detection dogs, and the last time he was a student at a police dog school or seminar was in 1993 at Lackland.

Nicely is currently self-employed, doing pet dog training and consulting involving police dogs.

Nicely acknowledged that the State of Texas "has no standard whatsoever for a dog trainer," and he has no license or credentials in that field issued by the State of Texas or any other governmental unit.

Nicely testified he has trained hundreds of dog handlers and trained over 700 dogs for use in drug detection.   In training a drug dog, it is necessary to identify the task and to identify the final response.   The trainer uses a stimulus, e.g., drugs, to induce a certain response from the dog.   After that, the handler must eliminate all cues and prompts that could influence the dog's behavior.

Mr. Nicely testified he did not consider Deputy Wintle and Kubo to be "reliable."   He reached this conclusion based on "the records that were provided, both field use or utilization reports or records that we had and his training records. I looked at the video involving the dog during this particular search.   And I looked at his statement, his report, involving this incident officially about it." (85:19-24).   Nicely opined that the dog in this case "didn't respond to the drugs on its own ... it went around the vehicle and then it tried to leave."   Kubo did exhibit what Nicely called a behavioral change (he did not believe that the term "alert" should be used) or "orienting response."   However, according to Nicely, Deputy Wintle (either consciously or subconsciously) sent cues to the dog suggesting to

-7-

the dog that it needed to respond.  Consequently, Kubo's response was not based upon the odorant, but was based upon the handler's actions.  (86:1-25).

Nicely perceived that the handler, Deputy Wintle, had a "mental set" that "there's something there and my dog's going to prove it."  According to Nicely, Wintle should not have been asking any questions of Davis and the defendant if he was going to be handling the dog.  Nicely was also critical of the training and field logs kept by Deputy Wintle, although he admitted he was able to glean the necessary statistical information from these records.

Mr. Nicely testified that he taught his handlers "that if their dogs fell below 80 percent of – of finds in the street, not residual... 80 percent of actual finds, get your dog off the street, get him evaluated and find out what the problem is."  Nicely stated the 80 percent goal was not achieved in this case because the training records did not reflect that the handler tried to eliminate incorrect responses and allow the dog to respond on his own. Based on his interpretation of the records, i.e., Exhibit 102, Nicely opined that Deputy Wintle's and Kubo's "response find ratio for finds of drugs, money and claims of residue" was only 56.41 percent.  Their find ratio for drugs and claims of residue was only 46.15 percent.  By Nicely's count (which was discredited on cross-examination), Kubo was deployed 32 times by Deputy Wintle to provide probable cause for a search of a vehicle, of a car, or vehicle, that was detained in a traffic stop.  The dog responded 26 times; however, the find ratio for drugs was only 26.92 percent and the find ratio for drugs, money, and claims of residue was only 57.69 percent.  Nicely asserted that Kubo was not properly trained because Nicely would expect an 80-plus percent find ratio.  He did not believe the team of Deputy Wintle and Kubo was reliable.

-8-

In Nicely's opinion, Wintle waited too long before deploying Kubo and should not have asked any questions of the occupants before deploying Kubo because the information he obtained would affect the way he handled the dog.  In summary, Wintle reportedly used practices that Nicely had abandoned years ago, and Nicely would have trained them to do things differently.   Based on the totality of what Nicely observed in the video recording (Exhibit 1), Wintle's handling of the dog "absolutely" increased the likelihood of a false response.  (111:6-10).

On cross-examination, Nicely acknowledged that numerous law enforcement agencies use the term "alert" in conjunction with drug detection dogs; he personally objects to the term because it is not found in behavioral science literature.  He did not believe the Nebraska Law Enforcement Training Center, a state agency, should have certified Kubo and Wintle in 2007.   Nicely was cross-examined extensively on the basis for his calculations of Kubo's find ratios.  The record shows that on November 7, 2006, Kubo sniffed 180 cars at Millard West High School, alerted to one vehicle, and residue was found in that vehicle; however, Nicely considered the 180-car search to be only a single search. Nicely also indicated on cross-examination that he considered unspecified records or information other than that contained in Exhibit 102, the record to which he referred on direct examination.   Apparently, in his statistical analysis, Nicely did not count any instances where the dog was deployed in "searches for probable cause" but did not respond, indicate or alert.  Nicely clarified on cross-examination that his report did not give the dog any credit for detecting "residue" because the reports did not indicate whether the alleged residue was actually tested, so the reporting officer could not be sure it was

-9-

actually drug residue.  He also admitted that a dog could legitimately respond to the residual odor of a substance that had once been in a vehicle but was no longer there.

Mr. Nicely admitted on cross-examination that, when he actually worked as a police officer, he would pull a person over, having already made the decision before getting out of the car whether he was going to write a hard ticket, a warning ticket, or give a verbal warning.  He was partnered with a dog.  He typically asked the occupants to get out of the car so they would not have access to weapons that might be in the car.  He sometimes, but not always, patted them down.  He routinely ran a registration check, and a check for wants and warrants.  If he was going to write a ticket, he wrote the ticket. While waiting for the data to come back, he would take his dog out and walk it around it around the car.  If there was no response, he put the dog back in the vehicle. He got the data back from the dispatcher.  If there were no wants or warrants, the detained driver was free to go.  In essence, Nicely believes that too much knowledge on the part of the handler will affect the dog's behavior.  In his opinion, a separate handler should be available to support the unit and should just come up and run his dog around the car without asking any questions.

## LEGAL ANALYSIS

### A.  Legality of Traffic Stop

"For purposes of constitutional analysis, a traffic stop is characterized as an investigative detention, rather than a custodial arrest." *United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001); *see United States v. Wheat*, 278 F.3d 722, 726 (8th Cir. 2001), *cert. denied*, 537 U.S. 850 (2002).  As such, a traffic stop is governed by the principles of *Terry v. Ohio*, 392 U.S. 1 (1968).  *Jones*, 269 F.3d at 924.  Under *Terry,* 392 U.S. at 21-22, a police officer may conduct an investigative stop if the officer has a reasonable suspicion

that the person stopped is, or is about to be, engaged in criminal activity.   *See also Delaware v. Prouse*, 440 U.S. 648, 663 (1979).   Reasonable suspicion requires a particularized and objective basis for suspecting the person stopped of criminal activity, but the level of suspicion required for a *Terry* stop is less demanding than that for probable cause.  *United States v. Gonzalez*, 220 F.3d 922, 925 (8th Cir. 2000) (internal quotations and citations omitted).  "A reasonable suspicion may be justified even if there are innocent explanations for a defendant's behavior when the circumstances are considered in the totality."  *United States v. Tuley*, 161 F.3d 513, 515 (8th Cir. 1998).  Even "[a] mistaken premise can furnish grounds for a *Terry* stop, if the officers do not know that it is mistaken and are reasonable in acting upon it."  *United States v. Ornelas-Ledesma*, 16 F.3d 714, 718 (7th Cir. 1994), *judgment vacated on other grounds*, 517 U.S. 690 (1996) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 184-86 (1990)); *accord United States v. Bailey*, 417 F.3d 873, 977 (8th Cir. 2005), *cert. denied*, 547 U.S. 1104 (2006); *see also United States v. DeLeon-Reyna*, 930 F.2d 396, 399 (5th Cir. 1991) (en banc) (per curiam); and *United States v. Walraven*, 892 F.2d 972, 974-75 (10th Cir. 1989)).

In this case, Wintle testified that he stopped the minivan because he observed a partially covered in-transit and a dim rear taillight. The videotape (Ex. 1) verifies Wintle's in-court testimony and nothing on the videotape contradicts his testimony.  I find Wintle to be credible and I further find that his stopping the minivan for a traffic violation was objectively reasonable.

## B.  Scope and Duration of the Traffic Stop

Having made a valid traffic stop, an officer is allowed to detain the occupants of the vehicle while completing "a number of routine but somewhat time-consuming tasks related

-11-

to the traffic violation, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning." *United States v. $404,905.00 in United States Currency*, 182 F.3d 643, 647 (8th Cir. 1999), *cert. denied*, 528 U.S. 1161 (2000); *see also United States v. Barragan*, 379 F.3d 524, 528-29 (8th Cir. 2004). "During this process, the officer may ask the motorist routine questions such as his destination, the purpose of the trip, or whether the officer may search the vehicle, and he may act on whatever information is volunteered." *United States v. $404,905,* 182 F.3d at 643; *see also United States v. White*, 81 F.3d 775, 778 (8th Cir.), *cert. denied*, 519 U.S. 1011 (1996); *United States v. Ramos*, 42 F.3d 1160, 1163 (8th  Cir. 1994), *cert. denied*, 514 U.S. 1134 (1995).  "'An officer may also question a vehicle's passengers to  verify information provided by the driver, and conflicting stories may provide justification to expand the scope of the stop and detain the occupants.'" *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005) (quoting *United States v. Barragan*, 379 F.3d at 529); *see also United States v. Flores*, 474 F.3d 1100, 1103 (8th Cir. 2007); *United States v. Williams*, 431 F.3d 296 (8th Cir. 2005) *cert. denied*, 126 S. Ct. 2912 (2006).

While I find Deputy Wintle's testimony to be credible, the best evidence of what happened following the stop is the videotape (Ex. 1)[2].  A review of the videotape will show the following:

00:00          Stop of minivan by Wintle.

00:03          Minivan directly in front of Wintle's cruiser.

---

[2]As the videotape does not contain a time mode, I timed the tape from the initial stop.

| | |
|---|---|
| 00:04 | Wintle talks with driver Davis, and Davis admits problem with taillight. |
| 00:09 | Davis to cruiser with Wintle.  Wintle asks about travel and Davis states he went to Oakland, California from Maryland for a "cookout" admitting to a trip of over 3,000 miles. |
| 00:12 | Radio records check of Davis and passenger Christy. |
| 00:14 | Wintle tells Davis he is going to write him a warning ticket. |
| 00:18 | Davis signs warning ticket and Wintle asks, "do you mind if I ask a couple more questions?"  Davis responds, "what, okay." Wintle again asks about travel Davis tells Wintle that during the trip they stopped at a hotel on the way to California and they stopped at a hotel during the return trip.  Davis also admitted that they did not arrive in Oakland until late Sunday evening. |
| 00:23 | Wintle exits cruiser to talk to passenger Christy. |
| 00:29 | Wintle asks Davis for permission to search – Davis grants permission to search his luggage and identifies the black suitcase as his. |
| 00:32 | Wintle out of cruiser to again talk to Christy. |
| 00:33 | Christy removed from minivan. |
| 00:36 | Kubo deployed and alerts to rear of minivan. |
| 00:43 | Drugs found and Christy taken into custody. |

The videotape (Ex. 1) also reveals that the routine tasks were accomplished in less than eighteen (18) minutes after which Wintle returned Davis' documents and asked Davis if he would mind if Wintle asked a couple more questions, to which Davis replied, "what, okay."

I find that Davis was no longer "seized" within the meaning of the Fourth Amendment after Wintle returned his documents, and a reasonable person in Davis'

-13-

position at the time he was asked for permission to search would "feel free to terminate the encounter and be on his way." Wintle did not re-seize Davis by asking him additional questions or by requesting consent to search. *See United States v. Morgan*, 270 F.3d 625, 630 (8th Cir. 2001), *cert. denied*, 537 U.S. 849 (2002). Nothing in the record suggests that Wintle acted in such a way that a reasonable person would believe that he was not free to decline the request for further conversation or terminate the encounter altogether. *See id.* Thus, I find that the traffic stop of less than 18 minutes was not unlawfully expanded, and that the subsequent contact between Davis and Wintle was consensual. *See, e.g., United States v. White*, 81 F.3d at 779 (after defendant's license and registration were returned and the warning was issued, the encounter "became nothing more than a consensual encounter between a private citizen and a law enforcement officer"); *United States v. Santos-Garcia*, 313 F.3d 1073, 1078 (8th Cir. 2002) (defendant was no longer seized within the meaning of the Fourth Amendment after officer returned his identification and issued a warning ticket). If the traffic stop was not unlawfully expanded as to the driver, Davis, it follows that the stop was not unlawfully expanded as to the passenger, defendant Christy.

### C.   Probable Cause to Search

After Christy denied Wintle's request for permission to search the vehicle, Wintle deployed his dog. The dog alerted and indicated to the rear of the minivan. The government relies on the dog's indication to establish probable cause to search.

The court agrees with the government that these issues are governed by *United States v. Donnelly*, 475 F.3d 946, 955 (8th Cir.), *cert. denied*, 127 S. Ct. 2954 (2007):

-14-

Assuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present. *United States v. Sundby*, 186 F.3d 873, 875-76 (8th Cir.1999). In finding sufficient the affidavit at issue in *Sundby*, we declared that "[in order to establish the dog's reliability,] the affidavit need only state the dog has been trained and certified to detect drugs.... An affidavit need not give a detailed account of the dog's track record or education." *Id.* at 876 (citations omitted). Such statements only establish the affidavit's facial validity, however. *Id.* (holding that the defendant would have been entitled to a *Franks* hearing had he shown that officers withheld negative information casting into doubt the dog's reliability).

The court finds that Kubo's "reliability" has been established in that the dog was trained and certified to detect drugs. Although the defense expert, Mr. Nicely, states he would have trained the dog and the handler differently, the record shows that Deputy Wintle and Kubo have satisfied the training and performance standards imposed by the relevant state agency. While Mr. Nicely, in his private sector capacity, aspires to an 80 percent "response find ratio" in the dogs he trains for paying clients, there is no evidence that the 80 percent figure is applicable, reasonable, or even relevant for purposes of public law enforcement training. Furthermore, as ably demonstrated on cross-examination, the methodology used by Nicely in evaluating Kubo's reliability was personal to Mr. Nicely. There was no showing that anyone other than Mr. Nicely evaluates the performance of a drug detection dog in that manner.

## RECOMMENDATION

In summary, I find Wintle acted reasonably in stopping the minivan. The traffic stop itself was completed in a reasonable amount of time (less than 18 minutes), and Davis' subsequent contact was consensual. The scope of the traffic stop was not unlawfully expanded as to the defendant, who was Davis' passenger. Wintle and his dog, Kubo,

-15-

were trained and certified by the State of Nebraska to detect drugs.  The dog's alert provided probable cause to search the minivan.

For these reasons,

**IT IS RECOMMENDED** that defendant's MOTION TO SUPPRESS (#27) be denied.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten (10) days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED January 25, 2008.**

**BY THE COURT:**

**s/ F.A. Gossett**
**United States Magistrate Judge**

-16-