IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:07CR238 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM AND ORDER |
| ERVIN CHRISTY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court on defendant's objection, Filing No. 43, to the magistrate judge's report and recommendation ("R&R"), Filing No. 42. The magistrate judge recommends denial of defendant's amended motion to suppress, Filing No. 27. The defendant has been charged with a drug-trafficking offense. He seeks suppression of evidence seized in the traffic stop of a vehicle in which he was a passenger on June 12, 2007.

**I. FACTS**

The magistrate judge held an evidentiary hearing on November 28, 2007. Filing No. 40, Transcript of Suppression Hearing ("Hr'g Tr."). Under 28 U.S.C. § 636(b), the court has conducted a *de novo* review of those portions of the report or recommendation to which defendant objects. *United States v. Lothridge*, 324 F.3d 599, 601 (8th Cir. 2003). The court has reviewed the record, including the transcript of the hearing and a videotaped recording of the traffic stop. Filing No. 40, Hr'g Tr., Hr'g Exhibit ("Ex.") 1. Except as noted in this order, the court generally agrees with the magistrate judge's factual findings, but disagrees with the application of the law to the facts. For the reasons set forth below, the

court finds defendant's objection to the magistrate judge's recommendation should be sustained and the motion to suppress should be granted.

Douglas County Deputy Sheriff Douglas Wintle testified at the hearing. Hr'g Tr. at 19 to 66. He testified that he is assigned to the criminal interdiction division, canine unit. *Id.* at 19. He testified that at the time of the traffic stop, he was patrolling without a partner and he had a drug dog in a caged area in the back of the squad car. *Id.* at 39-40. He pulled over a minivan, in which defendant was a passenger, because he noticed that its "in transit" plates were partially obscured. *Id.* at 25. Deputy Wintle testified that he did not stop the vehicle for any moving violations. *Id.* at 52. After initiating the stop, he asked the driver, Anthony Davis, to accompany him back to his squad car, as is his usual custom. *Id.* at 29.

He testified that he asked Davis, and later the defendant Christy, some questions, and they gave consistent accounts of their trip. *Id.* at 38. Deputy Wintle testified that Davis told him they had traveled from Maryland to California to attend a family reunion and were headed back home. *Id.* at 29. Davis stated that he had been in California for two days and that the passenger, Ervin Christy, was his cousin. *Id.* at 30. Deputy Wintle testified that Davis told him he was unemployed and going to school to open up his own business. *Id.* Davis also told him he wanted to see the country. *Id.* at 33. Deputy Wintle testified that Christy told him essentially the same thing. *Id.* at 31. Deputy Wintle testified that Davis stayed in the patrol car until Wintle issued a warning ticket, and remained there afterward. *Id.* at 53, 61.

Deputy Wintle testified that at the time he told Davis he was going to issue a warning ticket, he was suspicious because "we had two unemployed persons are traveling cross-country, which requires quite a bit of gas money" and that "it would have been a very,

2

very short stay and that's not consistent with persons traveling for reunions, parties, whatever." *Id.* at 33. He testified that the occupants had stated that they left Maryland on the previous Friday, and they were stopped on a Tuesday. *Id.* They told Deputy Wintle they left California on Sunday. *Id.* at 34. Deputy Wintle testified that his suspicions were raised by the fact that Davis did not know whether Christy was employed. *Id.* at 35. Deputy Wintle also testified that the purpose of the traffic stop was completed when he handed Davis the warning ticket, about 15 minutes after the beginning of the stop. *Id.* at 37. He stated that he was in possession of all of the information that raised his suspicion at that time. *Id.*

Deputy Wintle testified that Christy, the passenger and owner of the car, denied consent to search the minivan. *Id.* at 39. Other officers had arrived at the scene by the time Christy denied consent to search. *Id.* at 41. Wintle testified he consulted with the other officers and walked back up to the vehicle, asked Christy to get out of the car and frisked him. *Id.* at 41. He then brought out the drug detection dog to sniff the exterior of the car. *Id.* at 42. He testified that he deployed the dog because of a suspicion of criminal activity. *Id.* at 59. He testified that the dog alerted to the car by sitting to indicate that the odor of drugs had been detected. *Id.* at 42-43. The officers searched the vehicle and found three kilos of cocaine in the middle seat of the minivan. *Id.* at 44.

Steven Douglas Nicely, who had been retained as a consultant by the defense, testified at the hearing. *Id.* at 69-191. The government did not object to his testifying. *Id.* at 7-8. He was offered as a dog training expert by the defense, without objection by the government. *Id.* at 79. He testified that he is a licensed police trainer in the state of Texas and has received over 100 hours of education regarding the training of canines, dog

handlers and police officers in drug and contraband detection. *Id.* at 70-71. He has worked with canines for over thirty years. *Id.* at 70. He was trained at Lackland Air Force base and worked as a drug detection dog handler in the Marines from 1974 to 1979. *Id.* at 74. He was employed as a canine handler for two police departments from 1981 to 1989. *Id.* He was employed by Global Training Academy, a large private company that trains law enforcement officers and dogs for government agencies, for eighteen years. *Id.* at 73. In addition, he has taught courses on canine drug detection. *Id.* at 72. He is now self-employed. *Id.* at 77.

Nicely testified he has trained over 500 law enforcement officers as dog handlers as well as over 700 dogs for use in drug detection. *Id.* at 75. In training a drug dog, he stated that the trainer uses a stimulus, e.g., drugs, to induce a certain response from the dog. *Id.* at 76. The handler should eliminate all cues and prompts that could influence the dog's behavior. *Id.*

Nicely testified that, in his opinion, Deputy Wintle and the dog were not reliable. *Id.* at 99. He based his opinion on his review of Deputy Wintle's log of the dog's activities from July 25, 2006, to August 21, 2007, and review of the videotape of the stop at issue. He testified that the dog did not respond to drugs on its own and that Deputy Wintle, consciously or unconsciously sent cues suggesting a response to the dog. *Id.* at 108-110. He observed on the videotape that the dog first attempted to walk away after one full circuit of sniffing around the vehicle and that the dog was then pulled back to the rear bumper of the car by his handler. *Id.* at 101-07. He also observed another officer gesturing to the sides and rear of the car with a stick immediately before the dog was deployed. *Id.* at 102-03. He stated that it should not be necessary to signal to the car before deploying a well-

4

trained dog.  *Id.* at 102.  He further stated Deputy Wintle's raising his hand immediately before the dog sits on the videotape would be considered an inducement to sit.  *Id.* at 108. He stated that, in his opinion, the videotape shows that the dog was cued by his handler and the dog had not alerted on its own.  *Id.* at 109.

Nicely further testified that his review of the logs of the dog's activity showed that the dog had a positive response rate of only 46% for drugs and residue.  *Id.* at 93.  The dog's positive response rate rose to 57% if the sheriff's reports of residue, drug paraphernalia, or drug odor were included in his calculation.  *Id.* at 92.  He stated that, in his opinion, a response rate lower than 80% would be unacceptable.  *Id.* at 99.  The government cross-examined Nicely and offered the dog's training certificates into evidence, but offered no other evidence on the issue.  *See id.* at 69-111; Hr'g Ex. 2.

The court also reviewed the videotape of the stop.  In the videotape, Deputy Winkle questions the driver and then the passenger, both African-American males, for approximately 10½ minutes before he initiates a radio-check of license and registration information.  Deputy Wintle can be heard telling Davis that he pulled the car over because the vehicle's "in transit" license plate was partially obscured.  Deputy Wintle then inquires about Davis's destination and Davis answers that he is returning to Maryland from California, after attending a cookout with relatives.  Deputy Wintle also asks Davis where he stayed, with whom he was traveling, why he stayed in a La Quinta hotel, whether he was working, and whether he owned the minivan.  Davis answers the questions and states that the minivan belongs to the passenger, Davis's cousin, Ervin Christy.  At that point (6 minutes after the inception of the stop), Deputy Wintle exits the cruiser and approaches the passenger window of the minivan.  He converses with the passenger for about 2½

5

minutes.  Deputy Wintle then returns to the cruiser and again asks Davis essentially the same series of questions.  This time, he asks Davis where he was going, how long he was in California, whether his cousin works, where his cousin lives, and whether he's ever been arrested.

Ten minutes and 49 seconds after the inception of the encounter, Deputy Wintle can be heard conveying license and registration information to the dispatcher.  The dispatcher responds less than two minutes later.  Deputy Wintle continues to question Davis during that interval, asking Davis when he bought the vehicle and when he left California.  Thirteen minutes into the stop, Deputy Wintle states, "I'm going to give you a warning ticket."  Continuing to question Davis while he writes the ticket, Deputy Wintle again asks Davis what he was doing in California, whether he has lots of family there, why he drove all the way to California instead of flying, what his cousin's name is, and whether his cousin still lives in Chesterton.  Deputy Wintle hands Davis the ticket 16½ minutes after the start of the stop, and then states: "Do you mind if I ask a few more questions?"  Davis replies "Okay."

Deputy Wintle proceeds to ask Davis when he left California, what he was doing there, where he stayed, whether he and his cousin shared a hotel room, which relatives he visited, where the family reunion was, how the host of the reunion was related to him, whether he stayed at a hotel on the way out to California, and when he arrived in Oakland. This series of questions ends 20 minutes and 24 seconds after the beginning of the stop, after which Deputy Wintle states, "I'm going to talk to your passenger real quick."

Davis remains seated in the squad car and Deputy Wintle can be seen exiting the squad car and approaching the passenger window of the minivan.  Again, he stands at the

6

window conversing with the passenger.  Approximately four minutes later, another law enforcement officer can be heard opening the door of the squad car door.  He asks Davis a similar series of questions.  Davis answers the questions, and the officer comments that "it shouldn't be much longer."

Five minutes after he approached the minivan, Deputy Wintle returns to the squad car, comments that "like I told your cousin, another thing we do is drug interdiction," and asks Davis if he has any drugs, guns, of large sums of money. He then states "Do I have your permission to search the car?"  Davis replies that he does not own the car.  Deputy Wintle then asks Davis for permission to search his luggage, and Davis responds "Yes." Davis offers to get the luggage and the officer responds, "we'll get to it."

At 28 minutes into the stop, Deputy Wintle asks Davis for the car's registration again.  One and one-half minutes later, Deputy Wintle again exits the squad car to approach the minivan.  He stands at the passenger window for another two minutes.  The passenger then exits the minivan and is patted down by Deputy Wintle.  The passenger then sits on the guardrail next to the car, while Deputy Wintle returns to and walks past the front of the squad car.  Another minute and a half later, another officer can be heard telling the passenger to "come back here" and the passenger then approaches the squad car and walks out of range of the video camera.

At the 33-minute mark, Deputy Wintle takes the dog out of the squad car.  Another officer can be seen pointing to the front and sides of the car with a flashlight or other object.  Deputy Wintle walks the dog around the car once and the dog jumps on and sniffs the vehicle.  At the conclusion of one complete pass around the minivan, the dog attempts to return to the squad car, but is pulled back to the rear bumper by Deputy Wintle.  At the

7

36-minute mark, the dog sits briefly on the ground and Deputy Wintle and the dog return to the squad car.  Another officer then approaches the minivan, attempts to open the back, and then opens the passenger door to release the latch.  Two officers open the back door of the minivan and several officers start to search the car.  Forty minutes after the traffic stop began, the officers, apparently having found drugs, pull their weapons and order Davis and Christy to the ground.

In his motion to suppress, defendant Christy contends that law enforcement officers had no reasonable, articulable suspicion to justify his further detention after the conclusion of the traffic stop.  He also argues that he was interrogated without the benefit of *Miranda* warnings during the unlawful detention.  Further, he contends that the minivan was searched without consent or probable cause.  The defendant also contends that the drug dog's alert does not furnish probable cause to search because the dog is not reliable.

The government contends that the search was lawful.  It argues that the minivan was stopped for a traffic violation and during the stop, law enforcement officers  developed a reasonable articulable suspicion that criminal activity was afoot which justified the deployment of a certified drug dog.  It argues that the dog is reliable and its alert furnished probable cause for the resulting search of the minivan.

The magistrate judge first found that it was objectively reasonable for the officer to stop the minivan for a traffic violation.  He found that Davis was no longer "seized" within the meaning of the Fourth Amendment after Deputy Wintle returned his documents.  The magistrate judge further found Deputy Wintle did not re-seize Davis by asking him additional questions or by requesting consent to search and found that the "traffic stop of less than 18 minutes was not unlawfully expanded, and that the subsequent contact

8

between Davis and Deputy Wintle was consensual." He found "a reasonable person in Davis's position at the time he was asked further questions and for permission to search would 'feel free to terminate the encounter and be on his way.'" Filing No. 42, R&R at 14. Because the magistrate judge found that the driver of the minivan had not been unlawfully detained, he concluded that the passenger had not been unlawfully detained either. *Id.* The magistrate judge also found that the drug-detection dog's reliability had been established because the dog was trained and certified and that the dog's alert provided probable cause to search the minivan. *Id.* at 15.

## II. DISCUSSION

The Fourth Amendment "protects two types of expectations, one involving 'searches,' the other 'seizures,'" *United States v. Jacobsen*, 466 U.S. 109, 121 (1984), and requires that both be reasonable. *City of Indianapolis v. Edmond*, 531 U.S. 32, 36 (2000). The temporary detention of an individual during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, is a "seizure" of a "person" within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809 (1996). When a police officer makes a traffic stop, the passenger in the car, in addition to the driver, is seized because a reasonable passenger would not believe himself free to leave. *Brendlin v. California,* — U.S. —, —, 127 S. Ct. 2400, 2407 (2007). Determination of the reasonableness of a seizure is a question of law. *See Muehler v. Mena*, 544 U.S. 93, 98 n.1 (2005). The reasonableness of a seizure depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers. *Terry v. Ohio*, 392 U.S. 1, 16-19 (1968).

9

As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. *Whren*, 517 U.S. at 809. Thus, any traffic violation, regardless of its perceived severity, provides an officer with probable cause to stop the driver. *United States v. Mallari*, 334 F.3d 765, 766 (8th Cir. 2003).

In connection with a legitimate traffic stop, an officer may detain a motorist while the officer completes certain routine tasks, such as writing a citation and completing computerized checks of a driver's license, vehicle registration, and criminal history. *See United States v. Fuse,* 391 F.3d 924, 927 (8th Cir. 2004); *United States v. $404,905.00 in United States Currency,* 182 F.3d 643, 647 (8th Cir. 1999) (referring to "routine but somewhat time-consuming tasks related to the traffic violation"). The officer may detain the driver as long as necessary to conduct these activities and to issue a warning or citation. *United States v. Jones,* 269 F.3d 919, 924 (8th Cir. 2001). While the officer performs these tasks, he may ask the occupants routine questions, such as the destination and purpose of the trip, and the officer may act on whatever information the occupants volunteer. *United States v. Olivera-Mendez,* 484 F.3d 505, 509 (8th Cir. 2007).

As long as a legitimate detention is not prolonged by additional questioning, that questioning will not amount to an additional seizure within the meaning of the Fourth Amendment, and officers will not need reasonable suspicion to ask a citizen being lawfully detained for his or her name, date and place of birth, or immigration status. *Muehler*, 544 U.S. at 101 (noting that mere police questioning does not constitute a seizure). However when an officer, while conducting a valid traffic stop, asks routine questions about the driver's destination, the purpose of the trip, and so forth, the individual is not legally

obligated to answer, may not be compelled to answer, and may not be arrested for refusing to answer. *$404,905.00 in United States Currency,* 182 F.3d at 647 n.2.

Although the permissible scope of a detention depends on "the particular facts and circumstances of each case," it must in any case "last no longer than is necessary to effectuate the purpose of the stop" and "be carefully tailored to its underlying justification." *Florida v. Royer,* 460 U.S. 491, 500 (1983). "[T]he Fourth Amendment does not require the release of a person seized [for a traffic violation] with probable cause 'at the earliest moment that step can be accomplished,' and . . . '[q]uestions that hold potential for detecting crime, yet create little or no inconvenience, do not turn reasonable detention into unreasonable detention.'" *Olivera-Mendez,* 484 F.3d at 510-11 (*quoting United States v. Childs,* 277 F.3d 947, 953-54 (7th Cir. 2002) (*en banc*)) (holding that a detention for a traffic violation is not unlawfully extended if its duration is lengthened to ask three brief questions related to possible drug trafficking amidst other traffic-related inquiries and tasks).

A canine sniff of the exterior of a vehicle <u>during</u> a traffic stop does not infringe a constitutionally protected interest. *United States v. Alexander,* 448 F.3d 1014, 1016 (8th Cir. 2006) (emphasis added). "Such a dog sniff may be the product of an unconstitutional seizure, however, if the traffic stop is unreasonably prolonged before the dog is employed." *Id.*; *Illinois v. Caballes,* 543 U.S. 405, 407 (2005) (noting that a seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time necessary to complete that mission). In determining whether a detention <u>following</u> a lawful stop of a vehicle is reasonable, a court must consider both the length of the detention and law enforcement officers' efforts to conduct their

investigation in a quick and unintrusive manner. *United States v. Beck,* 140 F.3d 1129, 1134 (8th Cir. 1998). Extending the duration of a traffic stop by two to four minutes without reasonable suspicion for a canine sniff performed after an officer has returned a traveler's documents is a *de minimis* intrusion on a motorist's personal liberty and will not amount to an unconstitutional detention. *See $404,905.00 in United States Currency*, 182 F.3d at 648-49 (involving a 30-second-to-two minute delay); *United States v. Alexander,* 448 F.3d 1014, 1017 (8th Cir. 2006) (finding a four-minute extension *de minimis*).

Generally, when an officer returns a motorist's travel documents and hands him a warning or citation, the traffic stop has ended. *United States v. White,* 81 F.3d 775, 778 (8th Cir. 1996); *see also United States v. Lyons,* 486 F.3d 367, 371 (8th Cir. 2007). After that, as long as a reasonable person would feel free to disregard the police and go about his business, the encounter becomes a consensual encounter. *United States v. Coney,* 456 F.3d 850, 858 (8th Cir. 2006). As part of a consensual encounter, an officer with no basis for suspecting a particular individual may generally ask questions of that individual, including a request for consent to search, provided the officer does not convey a message that compliance with the request is required. *Id.* The dividing line between a legitimate detention for a traffic violation and any subsequent consensual encounter is artificial and does not foreclose the momentary extension of the detention for the purpose of conducting a dog sniff of a vehicle's exterior. *Alexander,* 448 F.3d at 1017. However, once a traffic stop ends, the Fourth Amendment is implicated if an officer acts in such a way that a reasonable person would believe that he or she is not "free to decline the officer's requests or otherwise terminate the encounter." *See Florida v. Bostick,* 501 U.S. 429, 436 (1991). The crucial test is whether, taking into account all of the circumstances surrounding the

12

encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business. *Id.* at 437. A driver's consent to an extension of a traffic stop will not extend to a passenger who does not know such consent has been given. *See, e.g., United States v. Guerrero-Espinoza,* 462 F.3d 1302, 1310 (10th Cir. 2006).

Absent such a consensual encounter, an officer cannot continue to detain a motorist after the initial stop is completed unless the officer has "a reasonably articulable suspicion for believing that criminal activity [is] afoot." *Lyons,* 486 F.3d at 371 (noting that if an officer develops a reasonable, articulable suspicion that a vehicle is carrying contraband during a traffic stop, he has justification for a greater intrusion unrelated to the traffic offense). The level of suspicion necessary to constitute "reasonable suspicion" sufficient to justify a limited detention "is considerably less than proof of wrongdoing by a preponderance of the evidence" and "is obviously less demanding than that for probable cause." *United States v. Sokolow,* 490 U.S. 1, 7 (1989). "Some minimal level of objective justification" is required. *INS v. Delgado*, 466 U.S. 210, 217 (1984). "To be reasonable, suspicion must be supported by 'specific and articulable facts.'" *Sokolow,* 490 U.S. at 7. The officer must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry*, 392 U.S. at 27. Conduct that is typical of a broad category of innocent people provides a weak basis for suspicion. *United States v. Tillman,* 81 F. 3d 773, 775 (1996). The court considers the totality of the circumstances to determine whether police officers had reasonable suspicion to expand the scope of a traffic stop. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Bell*, 183 F.3d 746, 749 (8th Cir. 1999).

A warrantless search will not violate the Fourth Amendment if it is supported by probable cause. *United States v. Donnelly,* 575 F.3d 946, 954 (8th Cir. 2007). Probable cause equates to a fair probability that contraband or evidence of a crime will be found. *Id.* If a dog is reliable, "[a] dog's positive indication alone is enough to establish probable cause for the presence of a controlled substance." *United States v. Sundby,* 186 F.3d 873, 876 (8th Cir.1999). When the record raises questions about a dog's reliability, further inquiry is required. *Donnelly,* 575 F.3d at 995; *see also Caballes,* 543 U.S. at 411 (Souter, J., dissenting) (noting that "[t]he infallible dog, however, is a creature of legal fiction"). A certified dog who is shown to be successful in locating nontrace quantities of drugs more that 54% of the time has been found reliable in the Eighth Circuit. *See Donnelly,* 475 F.3d at 954 (also noting that the dog's record is one of many factors including consistent training, proper certification, an independent evaluation and the dog's pedigree, history, and behavior, although noting the dog "was not a model of canine accuracy").

Also, police may conduct a search of a person's vehicle without a warrant or probable cause provided that person voluntarily consents to the search. *United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000); *United States v. Parris*, 17 F.3d 227, 229 (8th Cir. 1994). The government bears the burden of proving voluntary consent. *United States v. Heath*, 58 F.3d 1271, 1275 (8th Cir. 1995). "Consent is voluntary if it was the product of an essentially free and unconstrained choice by its maker, rather than the product of duress or coercion, express or implied." *Bradley*, 234 F.3d at 366 (quotations and citation omitted). Again, courts evaluating voluntariness must examine the totality of the circumstances, including the accused's characteristics and the nature of the encounter. *Bradley*, 234 F.3d at 366. To establish voluntary consent, the government does not need

to prove that the accused was fully aware of his or her rights under the Fourth Amendment. *Heath*, 58 F.3d at 1275-76.

## III.  ANALYSIS

Defendant has not challenged the stop of the minivan for a traffic violation.  Thus, there is no dispute that the initial stop of the minivan was lawful.  The court finds, however, that the continued detention of the defendant beyond the point at which a warning ticket was issued violated his right to be free from unreasonable searches and seizures under the Constitution.  Deputy Wintle did not have a reasonable, articulable suspicion of criminal activity to expand the scope of the detention.  Further, the court finds that the search of the vehicle was not supported by probable cause.

The evidence shows that Deputy Wintle first inordinately delayed commencing the "routine" tasks related to the stop.  He waited more than ten minutes before transmitting license and registration information to the dispatcher, questioning the occupants in the meantime.  Twelve minutes into the stop, Deputy Wintle had ascertained that the travelers' documents were in order and they had no arrests or outstanding warrants.  By that time, he had decided to issue the driver a warning ticket.  In the context of the extensive questioning of the occupants that had already occurred, it is doubtful that a reasonable person in Davis's position would have felt free to leave or to decline the officer's request to answer a few more questions.  Davis's consent to further questioning cannot be considered voluntary.  Davis was not told he was free to leave or free to decline to answer Deputy Wintle's questions.  Most importantly, he was left in the cruiser while Deputy Wintle went to talk to the passenger.  He was then questioned by another officer who told him it

15

would not take much longer, implying that Davis was not free to end the encounter at that point.

Deputy Wintle testified that Christy and Davis gave consistent answers to his queries. The relentless and repetitive nature of the questioning shows that it is more in the nature of a custodial interrogation than a consensual conversation between a citizen and a law enforcement officer. Despite being given consistent answers and reasonable explanations, Deputy Wintle continued to question Davis and Christy in an apparent attempt to trip them up or poke holes in their stories. The court does not agree with the magistrate judge's conclusion that Davis was no longer "seized" after he was issued the warning ticket. At some point after the warning ticket was issued, the encounter regained its investigatory nature, at the latest when Deputy Wintle asked Davis to return the vehicle's registration.

Davis's ostensible consent to answer questions and to permit the search of his luggage has no bearing on the analysis of whether Christy continued to be detained. Even if the traffic stop ended and a consensual encounter between Deputy Wintle and Davis began when Deputy Wintle issued the warning ticket, there has been no showing that Christy knew of this fact. Any purported consensual encounter between Deputy Wintle and Davis would not affect the nature of the passenger's detention. As far as Christy was concerned, the traffic stop had not ended and Christy remained detained. Christy could not have believed he was free to leave or to decline further questioning since Davis, the driver, remained in the cruiser.

There was no evidence that the information Deputy Wintle gleaned from Christy during the last conversation provided any cause for suspicion. By the time Deputy Wintle

approached the minivan for consent to search, he was in possession of all of the information that he later testified provided the basis for deployment of the dog.  Deputy Wintle testified that he based the decision to deploy the dog on a suspicion of criminal activity as the result of the air freshener, the itinerary, and the travelers' employment status.

He further testified that Christy then declined consent to search the vehicle.  In seeking consent, an officer should not convey a message that compliance is required.  The dog was deployed immediately after the consent was denied.  The evidence favors the inference that the decision was more likely triggered by Christy's failure to consent.  It defies common sense to assume that factors unrelated to the refusal to consent would coincidentally crystalize in Deputy Wintle's mind to form a reasonable suspicion at the same time Christy refused consent.  A reasonable person in Christy's position clearly would not have felt free to decline the request, and, in fact, he was not free to decline the request.  After doing so, the duration and scope of the detention were extended to allow for the dog sniff.  Any doubts that Christy was free to leave were extinguished when, after refusing consent to a search of his automobile, Deputy Wintle ordered Christy out of the automobile to frisk him.  At that point at the latest, having been ordered out of his vehicle in order to permit a drug dog sniff, no reasonable person in Christy's situation would have felt free to leave.

Nor can the court find that the extension of the legitimate stop amounts to a *de minimis* intrusion.  A reasonable officer could have effectuated the purpose of the stop—to issue a warning ticket for obscured license plate and a dim taillight—in a very short time, a matter of minutes.  Instead, after dallying for more than ten minutes before initiating the

computer check, he continued to extensively question the vehicle's occupants after it became clear that a warning ticket was appropriate. Deputy Wintle's questioning went far beyond the type of inquiries incident to a traffic stop. Although an officer is free to inquire on unrelated topics during a lawful stop, he is not free to extensively prolong the stop by reason of the unrelated inquiries. The record shows that the encounter was unreasonably extended by Deputy Wintle's prolonged attempts to obtain information that could somehow be interpreted as suspicious. The length of the detention, already prolonged by the tardy computer check, was then further expanded when, sixteen minutes after the occupants were first pulled over, Deputy Wintle attempted to engage them in a consensual encounter. The occupants were then detained for an additional twenty-four minutes, being effectively "grilled" by law enforcement officers the entire time.

Further, the court finds that Deputy Wintle has not articulated facts that show an objectively reasonable suspicion that justified the continued detention to conduct the dog sniff. Notably, the drug-detention dog was present in the vehicle the whole time. Only a dog sniff that occurs in the course of a legitimate traffic stop will not trigger Fourth Amendment protections. Because a dog sniff of the exterior of a vehicle is not a search, Deputy Wintle could have deployed the dog earlier in the stop, had he been so inclined. The fact that he did not do so indicates that he had no reason to suspect criminal activity until he approached the minivan to ask for consent to search it. If the officer had sufficient reasons to justify a dog sniff, or any objectively reasonable basis for a belief that the sniff would be fruitful, he would have had no reason to seek consent. Similarly, if the facts that established suspicion were known to Deputy Wintle at the time he ended the traffic stop,

18

why did he continue to question the car's occupants and attempt to obtain consent? Deputy Wintle's rationale does not hold up to scrutiny.

The factors cited by Deputy Wintle as bases for a reasonable suspicion of criminal activity are not sufficient.  Deputy Wintle first relied on the scent of an air freshener.  That factor, without more, does not create suspicion; a broad category of innocent people use air fresheners.  Moreover, Deputy Wintle cannot point to any inconsistencies in the two occupants' stories that would arouse suspicion; he conceded that they gave consistent accounts.  Instead, Deputy Wintle testified that he relied on the travelers' dubious itinerary and unemployed status as suspicious.  Those factors are not inherently suspicious.   It is not unusual for a young person to drive to the west coast to see mountains and scenery in the summertime.  It is not unusual or suspicious to attend a family reunion.  Nor is it suspicious to take a trip of a short duration or for a young person to drive extended periods without stopping.

There is nothing inherently suspicious in Davis's explanation that he had recently completed school and wanted to travel before he started working in his mother's assisted-living business.  Also, it is not particularly unusual for a person not to know whether his cousin and traveling companion is employed, especially if they are students or if previous employment has been temporary or sporadic.  The evidence supports the conclusion that Deputy Wintle's detention of these individuals and the subsequent search of their vehicle was pursuant to nothing more than a "hunch."

Further, the court finds the government has not rebutted Christy's showing that the dog's alert was not reliable.  A statistical analysis in these circumstances is of limited value

because there are unknown variables.[1]  Nevertheless, some conclusions can be drawn. The court's review of the dog's activity log shows that the dog's response corresponded to the presence of nontrace quantities of drugs only 5 times out of 32 dog sniffs of vehicles.[2]  If positive responses to residue or paraphernalia are included in the analysis, the dog responded to drugs in only 10 of 32 total sniffs.  These figures at least raise a question about the dog's reliability.

Although the dog was certified by Nebraska law enforcement officials, the government presented no evidence concerning the dog's training or the state's certification process.  The government did not apprise the court of the level of correct responses that would be expected of a well-trained dog.  Nor has the court been presented with evidence that shows the success rate required for certification.  The government's reliance on Eighth Circuit caselaw for the proposition that a success rate of over 50% makes a dog presumptively reliable is inapposite.  The rate refers to findings of nontrace quantities of drugs.  It is not clear that this dog would satisfy that standard.  Moreover, the Eighth Circuit relies on a dog's success rate as one of many factors.  Based on this record, the court cannot determine the ratio of indications (or alerts) to successful finds that would amount to presumptive reliability for a drug detection dog.  Let it suffice to say that combined with expert Nicely's testimony of a 46%-drugs/residue response rate and when it appears that a dog's indication that a particular vehicle contains drugs is correct 30% of the time, a court should not merely rely on the fact that the dog has been certified to establish, as a matter of law, that the dog is reliable.

---

[1]It is not possible to know how often the dog failed to alert on vehicles containing contraband.

[2]This figure would be 5 of 29 sniffs if sniffs resulting in finding money were taken out of the calculus.

The court also finds that the government has not rebutted the defendant's showing that the dog's alert to drugs in this particular case was not reliable. Defendant presented testimony by a credible witness, based on observation of a videotape of the episode, that the handler was cueing or suggesting a response to the dog and that the dog's resultant "alert" was not reliable. That testimony is borne out by the court's review of the handler's conduct in the videotape. With only the mere fact of certification to counter that evidence, the court is unable to conclude that the dog's alert in this case is reliable and thus cannot conclude that the supposed "alert" to the presence of drugs furnishes probable cause for the search of the vehicle. Accordingly, the court finds that defendant's objection to the R&R should be sustained and the defendant's motion to suppress should be granted.

IT IS ORDERED:

1.  The defendant's objection, Filing No. 43, to the magistrate judge's R&R, Filing No. 42, is sustained.

2.  The defendant's motion to suppress, Filing No. 27, is granted.

DATED this 19th day of March, 2008.

BY THE COURT:


Joseph F. Bataillon
Chief United States District Judge